**ARROW COACH LINES et al. v. PENN-SYLVANIA CASUALTY CO. et al.**

**No. 9904.**

Court of Civil Appeals of Texas. Austin.

Oct. 25, 1950.

Rehearing Denied Nov. 8, 1950.

Strasburger, Price, Holland, Kelton & Miller, by Hobert Price, of Dallas, for appellants.

Hart, Brown & Sparks, by J. H. Hart, of Austin, for appellees.

HUGHES, Justice.

This controversy is between two insurance companies, each of which was the insurer of a different bus company. Appellee Pennsylvania Casualty Company was the insurer of Creamer Coaches, and appellant Highway Insurance Underwriters was the insurer of Arrow Coach Lines.

Other parties are present but since they are in no way affected by the judgment and

make no complaint they will not be further noticed.

The subject-matter of the suit is a number of claims which arose from accidents occurring on the Creamer Coach routes but subsequent to the execution of a contract of sale between Creamer and Arrow, by which the Creamer lines were to be purchased by Arrow and under which contract Arrow took full control of the Creamer buses and their operations prior to the occurrence of such accidents.

These claims have all been settled; payment being made either by Pennsylvania acting alone or by Pennsylvania and Highway Underwriters acting together.

The judgment of the trial court, acting without a jury, was that Highway Insurance Underwriters was, as between it and the Pennsylvania Casualty Company, exclusively liable for payment of the claims.

The facts are all without dispute and will be stated as concisely as possible.

On June 12, 1945, Creamer and Arrow entered into a sales contract by which Arrow agreed to purchase all of the properties of Creamer Coaches, including permits, licenses, etc., for a consideration of $140,000; $90,000 to be paid on or before June 16, 1945, and the balance to be evidenced by a note bearing interest from June 16, 1945, and payable in monthly installments. This note was secured by a chattel mortgage on the properties being sold. The contract further provided that:

"The purchaser shall take over the property covered by this contract as of midnight, June 15th, 1945, including all schedules operated on or after midnight on such date. The seller shall pay all operating and current expenses up to midnight of said date and the purchaser assumes all operating expenses from and after midnight of said date."

Provision was also made for prorating the ad valorem taxes as of June 15, 1945.

The contract then provided that: "This contract is in all things subject to approval by the appropriate State and Federal governmental agencies charged by law with the supervision of the business sold and conveyed in this contract, but the purchaser assumes the burden of proceeding with reasonable diligence and at his own cost and expense to obtain such approval within a reasonable time from date hereof."

On or before the 16th of June, 1945, the $90,000 cash was paid Creamer and the note and chattel mortgage were executed and delivered to Creamer by Arrow as agreed; and there has been no default on the note.

At midnight of June 15, 1945, physical possession and control of Creamer Coaches and its properties were delivered to and accepted by Arrow. This transfer of possession and control was complete. We quote briefly from the unchallenged findings of the trial court:

" * * * After midnight, June 15, 1945, neither Creamer Coaches nor any of its members was in possession of any of the Creamer properties which were agreed to be sold to Arrow, or exercised or had, or attempted to exercise any control over any of said properties or the operation of any buses over any of said routes. From midnight, June 15, 1945, all of said properties and the operation and control of them were in Arrow exclusively.

"Within a few weeks after June 15, 1945, Arrow Coach Lines removed from Temple, Texas, the offices and shops maintained by Creamer Coaches at Temple until June 15, 1945; and after June 15, 1945, Arrow, without consultation with Creamer, rearranged and changed such of the bus schedules as Arrow chose to change; and Arrow hired such persons as it chose to operate the buses over the routes, and discharged or discontinued employment of such of the former Creamer employees as Arrow chose to discharge or discontinue in employment."

On August 7, 1945, the Railroad Commission approved the application for permission to sell the Creamer permits to Arrow, and on August 23, 1945, the Railroad Commission issued to Arrow and in Arrow's name duplicate permits or certificates in lieu of those formerly held by Creamer and sold by it to Arrow. Since August 23, 1945,

Creamer has not held any Railroad Commission permits authorizing the operation of buses.

The sale from Creamer to Arrow was approved by the Interstate Commerce Commission on March 15, 1946.

There were three accidents on the Creamer lines subsequent to June 15, 1945. The first occurred on July 1, 1945, in Lampasas County. In this accident an automobile was destroyed, a woman seriously injured, and a small child killed. Claims arising from this accident were asserted against both Highway and Pennsylvania but were settled and paid by Pennsylvania, without participation by Highway, for $425. The bus involved in this collision was one purchased by Arrow from Creamer by the contract of June 12, 1945.

The second accident occurred on October 6, 1945. On that date one of the buses which Arrow bought from Creamer under the June 1945 contract overturned while traversing a Creamer bus route. Several passengers of the bus were injured and asserted claims against both the Creamer and Arrow lines. Arrow Coach Lines refused to participate in the compromise, adjustment and settlement of these claims, and they were settled and paid by Pennsylvania in behalf of Creamer Coaches. These settlements were made in full satisfaction of all damages and injuries sustained by the claimants in the overturning of such bus. The total amount paid by Pennsylvania to satisfy these claims was $4,460.10.

On November 14, 1945, the third, and last, accident occurred. It happened on one of the Creamer routes but the bus involved had never belonged to Creamer. It was obtained by Arrow from other sources. The cause of the accident was the defective condition of the bus. Two bus passengers and the bus driver were injured in this accident. The driver filed his claim with the Industrial Accident Board and gave his employer as Arrow Coach Lines. Creamer Coaches and its insurer, Pennsylvania Casualty Company, were impleaded in the claim before the Board. The Board found that the driver was not an employee of Creamer

and awarded him compensation against Arrow and its insurer, Highway Insurance Underwriters. From this award Arrow and Highway appealed to the District Court.

The two injured passengers sued both Arrow and Creamer in the District Court.

Arrow and Creamer, acting jointly and without prejudice to themselves, settled these three suits by paying the driver $4,500, one passenger $500, and the other passenger $5,000.

Pennsylvania Casualty Company knew of the proposed sale from Creamer to Arrow and was notified of the transfer of possession and control of the Creamer lines on June 15, 1945.

In May 1945, Creamer, anticipating that it would continue ownership and operation of its buses during the remainder of 1945 and during 1946, directed Pennsylvania to renew its Workmen's Compensation and public liability insurance policies expiring on June 26, 1945. This Pennsylvania did.

After June 16, 1945, Arrow, while in complete control of the Creamer lines, kept separate accounts of the business done over the Creamer routes. From these accounts Arrow paid monthly premiums to Pennsylvania on the Creamer policies of about $800 each until the policies were cancelled on November 26, 1945.

These premiums were accepted and have been retained by Pennsylvania with full knowledge that Creamer Coaches did not operate the Creamer lines after June 15, 1945, but that they were operated by Arrow after such date.

Pennsylvania did not, at any time, issue any policy of insurance to Arrow Coach Lines.

The policies of public liability insurance issued by Pennsylvania and Highway to Creamer and Arrow, respectively, contained this provision:

"It is understood that the policy to which this endorsement is attached is to be offered for filing by the above named insured with the Railroad Commission of Texas as a condition precedent to the privilege to operate as a motor bus company within the

State of Texas under the authority of a certificate of convenience and necessity heretofore issued. * * *

" * * * Coverage granted by this endorsement also applies to motor buses belonging to or under the direction of the named insured and not particularly identified in this policy, while the same are being used by the named insured in the business of carrying passengers for hire within the boundaries of the State of Texas, and coming within the terms of the statute above referred to, and it is agreed that subject to the policy limits, this endorsement covers the liability imposed by law upon the named insured by reason of any bodily injury to, or death of, any persons other than the named insured and his employees, or loss or damage to the property of any persons other than the named insured occurring during the term of said policy, through the operation of such motor buses within the boundaries of the State of Texas."

Section 13, Art. 911b, Vernon's Ann. Civ. St., requires a motor bus carrier to file with the Railroad Commission both Workmen's Compensation and public liability insurance policies and provides for the cancellation of the permit under which the carrier operates, unless the policies are kept in force "so as to provide continuous and unbroken protection to the public having legal claims against such motor carrier."

The trial court further found that:

" * * * At the time the sales contract of June 12, 1945, was made, Arrow Coach Lines knew that approval of the sale by the Railroad Commission and the ICC could not be obtained for some months after June 15th, and that pending approval of the sale and issuance of duplicate certificates to Arrow, the insurance required by the law to be carried on the buses must be maintained and the premiums accruing on it paid; and Arrow knew that the operating expenses of the Creamer bus lines and properties would include payment of such premiums and claims."

Continuing, the court found that such premium payments made by Arrow to Pennsylvania were "for the purpose of keeping the policies of insurance in effect for the benefit of Creamer until final approval by the ICC of the sale of the Creamer permits to Arrow Coach Lines."

Appellant has numerous points of error, most of which are based on the contention that it has no liability in the premises because Pennsylvania, with full knowledge of all the facts, accepted premiums from Arrow, whereas it, appellant, received no increased premium payments after Arrow took over operation of the Creamer buses.

If incorrect in this position, then appellant urges that it and Pennsylvania are each liable for one-half the losses reflected by this record.

Lastly, appellant questions the right of Pennsylvania to bind it by claim settlements made without its consent.

In arguing its non-liability appellant cites these cases only: Trinity Universal Insurance Co. v. De Martini, Tex.Civ.App., 118 S.W.2d 901 (El Paso, Writ Ref.); Sly v. American Indemnity Co., 127 Cal.App. 202, 15 P.2d 522; Glens Falls Ins. Co. v. Bendy, Tex.Com.App., 58 S.W.2d 1; American Employers' Ins. Co. v. Hookfin, Tex.Civ. App., 33 S.W.2d 801, 805 (Galveston, Writ Ref.); and Federal Surety Co. v. Jetton, Tex.Com.App., 44 S.W.2d 923, 926.

The first two cases are to the effect that, as to liability insurance, the question of title to or ownership of a motor vehicle is not material to the risk. The soundness of this rule is not questioned but the rule is of no consequence here, because the liability policies of Pennsylvania and appellant expressly provide that "coverage granted by this indorsement also applies to motor buses belonging to or under the direction of the named insured."

In the Glens Falls case the court held that a provision in a fire insurance policy rendering the policy void, if foreclosure proceedings were instituted against the property insured, was waived where the insurance company collected past due and unearned premiums after notice of the commencement of such proceedings and after loss of the property by fire.

It will be noted that this case is between the insurance company and the insured, who

were bound together by contract, and not, as in the case at bar, between two insurers between whom no privity of contract exists.

In the Hookfin case the trial court found upon sufficient oral testimony that an employer took out two Workmen's Compensation policies, one to cover a certain group of employees and the other to cover a different group of employees, and accordingly held each insurance company, separately and respectively liable for the employees in the group insured. This holding was approved on appeal, the court saying: "There was, therefore, no double insurance in this instance, and under the very terms of the two policies involved, appellant was exclusively liable for the full amount of the compensation found to be due, there being furthermore no privity of contract whatever between it and the Union Company with reference to this risk."

The Jetton case was a Workmen's Compensation suit. The undisputed evidence showed that the insurance company against which a judgment was rendered by the trial court had not insured the employer at the location where the employee was injured, but that such insurance was carried by another company. In reversing and rendering this judgment the court said:

"There is no contention that it was the intention of the employer to carry double insurance, and it is furthermore shown without dispute that there is no privity of contract whatever between the Federal Surety Company and the Commercial Standard Insurance Company with reference to this risk. There is nothing in this record to show any intention whatever on the part of the Federal Surety Company to issue a policy to cover the employer at Dallas, Tex., or that it received any premiums based upon the pay roll of the employees of that company at Dallas, Tex.

\*    \*    \*    \*    \*    \*

"To hold that the Federal Surety Company has issued a bond in favor of the employer at Dallas, as contended for, and hold that company liable thereon, would be to create a bond where none existed, and would thereby create an obligation in the face of the undisputed testimony of both the employer and the company that no bond was issued or intended to be issued by that company to cover the plant of the employer at Dallas, and such holding would be both unsound and unjust."

■ In our opinion the holdings of and the principles discussed in the two cases last above reviewed are much more to the benefit of appellee than appellant. They emphasize and hold that where, as here, there is no privity of contract between two insurers who are attempting to shift a loss from one to the other that liability must be based solely upon the true undertakings of the parties.

Pennsylvania undertook to insure Creamer and Creamer alone. The public liability policy which it issued provided that Creamer was the insured and that "coverage granted by this endorsement also applies to motor buses belonging to or under the direction of the named insured and not particularly identified in this policy *while the same are being used by the named insured in the business of carrying passengers for hire.*"

Creamer was not using any of the buses involved in the three accidents at the time of such accidents. Arrow and Arrow alone was then using the buses in the "business of carrying passengers for hire." In fact when the last two and more financially serious accidents occurred (October 6 and November 14) Creamer could not lawfully engage in the business of transporting passengers for hire over his former routes because his permits had then been lifted and reissued to Arrow by the Texas Railroad Commission.

The same simplicity which exonerates Pennsylvania from liability renders Highway Insurance Underwriters liable. It issued a public liability policy in which Arrow was the insured and which extended coverage to all buses used by Arrow while engaged in the business of hauling passengers for hire. The buses involved in the three accidents were so being used by Arrow when the accidents occurred and liability of Arrow's insurer follows as a matter of course.

The fact which irks appellant is that it received no additional premiums during Arrow's operation of the Creamer buses while the payment of premiums to appellee continued undiminished.

Even if the payment of these premiums to appellee constituted an unjust enrichment, we do not see how appellant has any interest in the matter which entitles it to complain. The truth is, however, that those premiums were paid to prevent cancellation of the Railroad Commission permits under which the Creamer lines operated. The three parties interested in this matter are Creamer, Arrow, and Pennsylvania, and neither has complained of any inequity. Appellant, being a stranger to the transaction, will not be permitted to do so.

Appellant's failure to collect additional premiums for Arrow's operation of the Creamer buses is a matter wholly between Arrow and appellant and one which is not involved in this suit.

█ As to the claim of the bus driver for Workmen's Compensation Insurance benefits for injuries received in the November 14th accident, the Industrial Accident Board and the trial court found that the driver was an employee of Arrow. In our opinion the evidence conclusively supports these findings. Appellee is, therefore, not liable for this claim since it only insured the employees of Creamer.

██ We also overrule appellant's contention that appellee is not entitled to be reimbursed for claims settled and paid by it without appellant's consent. The rule is that "money paid by one, who in good faith believed such payment necessary to protect his interest, even though he be mistaken as to the facts, is not a volunteer." Coke v. Bargaimes, Tex.Civ.App., 116 S.W.2d 904, 907 (Dallas, Writ Dis.). The facts here warrant the application of this rule.

The judgment of the trial court is affirmed.

On Appellants' Motion for Rehearing.

Appellants' motion for rehearing contains the following statement:

"The Court is in error in holding that none of the parties are affected by the judgment except Pennsylvania Casualty Company and Highway Insurance Underwriters.

"An examination of the judgment of the trial court will show that judgment was rendered in favor of Pennsylvania Casualty Company not only against Highway Insurance Underwriters but also against Frank E. Cofer, Alice Roberson Cofer, R. M. Belcher, Robert M. Belcher, M. O. Killion, Jr., and Mrs. M. O. Killion, Jr., individually and as partners constituting Arrow Coach Lines. Reference to appellants' brief will show the complaint made by these individuals of the judgment of the trial court."

This description of the judgment is correct.

It is, therefore, necessary to explain the second paragraph of our opinion where we say:

"Other parties are present but since they are in no way affected by the judgment and make no complaint they will not be further noticed."

All of the parties against whom a judgment was rendered, named above, did appeal. Only a single brief on behalf of all appellants was filed. In this brief there are found the following statements:

"We say that this is a very simple case. It is purely a controversy between Pennsylvania Casualty Company on the one hand and Highway Insurance Underwriters on the other. One or the other of these insurance companies are bound or liable for all the payments made in connection with the claims and suits and none of the partners of either Creamer Coaches or Arrow Coach Lines have any actual part in this controversy.

\* \* \* \* \* \*

"There is no question of the rights of the partners in Arrow Coaches or Creamer Coaches involved here. Insurance was taken out and the insurance companies must respond for their respective obligations."

We assumed that these statements were made by appellants in good faith and thus we were prompted to write the paragraph about which appellants now complain.

With this explanation and after a careful examination of all assignments in the motion for rehearing, we are of the opinion that it should be overruled. It is so ordered.